# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER SHOOK,

        Plaintiff,

v.                                    Case No. 04-CV-71004-DT

SCOTT REINACHER and RUSSELL LARSON,

        Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' "MOTION FOR SUMMARY JUDGMENT AND DISMISSAL"

This federal civil rights action is before the court on Defendants' April 1, 2005 "Motion for Summary Judgment and Dismissal." Plaintiff filed her response on April 29, 2005. Defendants filed a reply brief on May 6, 2005 and the court heard the parties' oral arguments at a hearing on June 8, 2005. For the reasons set forth below, the court will grant in part and deny in part Defendants' motion.

## I. BACKGROUND

Plaintiff Jennifer Shook filed this civil rights action after Defendants arrested her on May 26, 2002 on charges of resisting and obstructing a police officer under Mich. Comp. Laws § 750.479. Plaintiff, the store manager at Mugg & Bopps convenience store in Howell, Michigan, was arrested by the Defendants, Michigan State Police ("MSP") officers, following a confrontation over the confiscation of identification from a MSP decoy engaged in a tobacco buy "sting operation." MSP troopers Larson and Reinacher were working a "tobacco controlled purchase decoy operation" in the city of Howell along with a female decoy who would attempt to buy cigarettes with an

underage ID.  (Def.'s Mot. Ex. 1, 05/26/02 Report.)  Defendants visited several stores

where the decoy was sent in to buy cigarettes.  If the store refused to sell, they were to

record this fact and move on to the next location.  (*Id.*)

It is undisputed that the decoy attempted to buy cigarettes at the Mugg & Bopps

convenience store where Plaintiff was working, that the MSP decoy's ID was

confiscated and placed in the store's safe, that Plaintiff was ultimately arrested for

obstructing a police officer under Mich. Comp. Laws § 750.479, and that the charges

were dropped.  However, the parties contest the detailed facts surrounding the incident

leading to Plaintiff's arrest and the nature of Defendants' actions in arresting Plaintiff.

### A.  Defendants' Version of the Events on May 26, 2002

Defendants arrived at the convenience store where Plaintiff was working and

sent an underage decoy into the store to attempt to buy cigarettes.  (Def.'s Mot. Ex. 1,

Incident Report.)  The cashier, checked the ID and determined that the decoy was

underage, refusing to sell the cigarettes.  The cashier, however, refused to give the ID

back to the decoy.  Instead, he handed the ID to Plaintiff who ultimately placed the ID

through a slot into the store's safe.  (Larson Dep. at 29-31.)  Defendant Larson was in

the store during the attempted purchase while Defendant Reinacher did not enter the

store until after the decoy exited and informed him that the ID had been confiscated.

(Larson Dep. at 19; Reinacher Dep. at 18-19.)

Larson testified that he observed the attempted purchase on May 26 and that he

approached Paul Clos, the cashier, and Plaintiff once the ID was taken.  (Larson Dep. at

20-27.)  He testified that he identified himself as a state trooper and showed the

employees of the store his badge.  (Larson Dep. at 24-25.)  He then asked Plaintiff and

2

Clos to return the ID, eventually demanding that it be returned *before* it was placed in the safe. (*Id.* at 25-32.) Defendant Reinacher testified that he did not witness Plaintiff place the ID in the safe, but that his fellow officer informed him that she had already done so when he entered the store. (Reinacher Dep. at 21.) Defendants say that the employees ignored Larson's commands to return the ID. (*See* Larson Dep. at 26-29; Reinacher Dep at 21-22.) Defendant Larson determined that they were resisting and obstructing police duties by refusing to return the ID to him when Plaintiff had access to the safe. (*Id.* at 29.)

Defendants aver that they warned Plaintiff that she would be arrested for resisting and obstructing if she refused to return the ID. (*See* Reinacher Dep. at 21.) Defendants also testified that they did not see the store policy of confiscating identification on the entrance door, nor did they remember speaking to the store owner on the telephone during this incident. (*See* Larson Dep. at 22.) According to Defendants, Plaintiff ignored their requests, walking away to assist other customers. (*Id.* at 23-24.) Defendant Reinacher testified that Plaintiff "pulled away from [him] trying to get away . . . after [he] had already put [his] hands on her." (*Id.*) Defendant Reinacher had advised Plaintiff that she was under arrest when she started to walk away and he grabbed a hold of her arm. (*Id.* at 24-25.) Defendant Reinacher put his hands on Plaintiff's arms as she pulled away. He then put Plaintiff's arms behind her back and escorted her through the back hallway of the store, where she allegedly threw herself to the floor. (*Id.* at 30.) Reinacher claims that Plaintiff was thrashing and resisting him, trying to pull away. (*Id.*) He also testified that he bend down to pick her up from the floor, grabbing her underneath her armpits to help her up. (*Id.* at 31.) He

3

indicated that he did not jam his knee into her back.  (*See id.* at 31-32.)  Reinacher then

escorted Plaintiff outside, where she allegedly continued to resist.  (*Id.* at 33.)  Once out

of the store, he handcuffed Plaintiff and placed her into his police car.  (*Id.* at 33-36.)

Plaintiff was taken to the Livingston County Jail where she was booked and held

overnight.  She was released the following day and she was not prosecuted based on

the arrest charges.

### B.  Plaintiff's Version of the Events on May 26, 2002

Plaintiff, a store manager for approximately five years, was working at the Mugg

& Bopps store along with employees Paul Clos, Cam Dean, and Wade Killinger.  (*See*

Pl.'s Dep. at 13, 26, 30-31.)  Paul Clos was working the cash register and was the

employee who initially refused to permit the decoy to purchase cigarettes, (Pl.'s Ex. C,

Clos Dep. at 7), Cam Dean was another employee working that day, and Killinger was

an assistant manager covering a shift on that day.  (Pl.'s Ex. E, Killinger Dep. at 6.)

The MSP decoy, a younger girl, entered the store and attempted to purchase

cigarettes from Clos.[1]  Clos testified that the female looked to be underage or "iffy" and

asked for her identification.  (Clos Dep. at 7.)  Clos, after recognizing that the female

was not of age, refused to sell tobacco to the decoy and confiscated her identification.

(*Id.*; *see also* Pl.'s Dep. at 26.)  Clos and Plaintiff kept the identification pursuant to a

store policy that was posted on the entrance door and on signs near the cash registers.

(*See* Pl.'s Dep. at 26; Clos Dep. at 7.)  Several employees, managers, and the owner

testified that, under Mugg & Boggs's policy, false or underage identification discovered

---

[1] Defendant Larson testified that the state police used underage volunteers with
actual licenses in their undercover tobacco buy operations.  (Larson Dep. at 13-14.)

4

by employees in the attempted purchase of tobacco or alcohol is confiscated, destroyed (cut up), placed into a safe, and the employees are instructed to call local police to document the incident.  (*See, e.g.*, Pl.'s Ex. D, Todd James Lekander I Dep. at 5-6; Killinger Dep. at 5; Todd James Lekander II Dep. at 6-7; Pl.'s Dep. at 26.)  The store's owner testified that he offers financial incentives to his employees who prevent illegal purchases, noting the significant penalties that his business might suffer if his employees permit such illegal transactions.  (Lekander I Dep. at 7.)

According to Plaintiff, she took the confiscated state license from Clos and placed it into a time-delayed safe before Defendant Larson showed his badge and demanded that Plaintiff return the license.  (Pl.'s Dep. at 28.)  Clos testified that an officer dressed in plain clothes (Defendant Larson) was walking around the store like a customer and approached him, asking for the ID back, but that it had already been dropped in the safe.  (Clos. Dep. at 9.)

Assistant Manager Wade Killinger, who was also working that day, testified that he saw the female approach the cash register to make the purchase and that Paul Clos noticed that she was underage.  (Killinger Dep. at 7.)  According to Killinger, Clos immediately turned to Plaintiff and she came up and took the girl's identification.  (*Id.*) He stated that "as [Plaintiff] was placing it in the safe, another younger cop, [with] kind of dark hair, real short, said he was a cop.  He showed what appeared to be a badge, and – but all within that same motion, [Plaintiff] was placing – she didn't cut the ID up, she just placed it in the safe."  (*Id.*)  Killinger also testified that he informed the officers that the ID was in the safe, that the safe timer was on, and it would be at least ten minutes before they could access the safe.  (*Id.* at 9.)

5

Defendants acknowledge that both officers were dressed in plain clothes, but claim that Officer Larson was present in the store at the time of the attempted purchase and that Plaintiff placed the ID in the safe *after* Larson identified himself. According to Larson, Plaintiff placed the ID in a slot leading to the safe after he showed his badge and demanded that it be returned. (*See* Larson Dep. at 28-32.) Defendant Larson also testified that he informed Plaintiff that she would be arrested for obstruction before Plaintiff placed the ID in the safe. (*Id.* at 32-33.)

Plaintiff testified that the officers came into the store and asked for the license back, telling the employees that they would be arrested if they did not return the ID. (Pl.'s Dep. at 29.) Plaintiff had access to the safe, but called Todd Lekander, the store owner, to see what she should do. (*Id.* at 29, 37.) Plaintiff testified that one of the officers spoke with him on the phone. (*Id.* at 30.) Todd James Lekander II, testified that Plaintiff called him personally on the day in question, that she was upset about the incident, but that her call was cut off. (Lekander II Dep. at 7-8.) He also stated that Plaintiff called Lekander's father that same day. (*Id.*)

The elder Lekander, the store's owner, testified that Plaintiff phoned him on May 26, 2002. She informed him that one of the clerks had taken a license from an underage person who was attempting to buy cigarettes and that the license was placed in the store's safe. (Lekander I Dep. at 9-10.) She also told him that the police officers were demanding that she return the license. Lekander stated that she asked for his help and that she was very agitated, flustered, and appeared to be upset. (*Id.* at 10.) Lekander informed Plaintiff to call the local police and that he would have somebody sent to the store to make sure the police get the license back. (*Id.* at 10.) Lekander

6

next explained that Plaintiff gave the telephone to one of the officers and he spoke to

that individual.  (*Id.*)  According to the store owner, the officer said that he was going to

arrest the clerk if the license was not returned immediately.  (*Id.*)  He responded by

telling the officer that he would return the license and asked the state officer to call the

local police to come and write a report, then the local police would return the license.

(*Id.* at 10-11.)  He explained that it was store policy for local authorities to give back the

license.  He also described the officer's reaction as "incredulous" when he suggested

that local authorities be called to the scene.  (*Id.* at 11.)  Lekander assured the officer on

the phone that we would have somebody down to the store momentarily "and he

needed to please wait a moment because he was threatening all kinds of action,

everything from closing the store to arresting everybody."  (*Id.*)  Lekander testified that

the call ended with his impression that the officer would call local police and wait.  (*Id.*)

Plaintiff testified that, after giving the phone to the officer, she went to assist

another employee needing help with a customer.  (Pl.'s Dep. at 30.)  As she went to

help Cam Dean with making coffees, Defendant Reinacher came through the back

doors asking for the license and swearing at her.  (*Id.*)  Plaintiff stated that Defendant

Reinacher yelled for her to "give him my F-ing ID," and that this was the first thing

Defendant had said to her.  (*Id.* at 31.)  She responded by telling him that she would

give him her ID when she was finished helping the customer.  According to Plaintiff,

Defendant Reinacher then grabbed her arms and started throwing her to the back room

of the store.  (*Id.*)  She stated that he was forcing and pushing her.  (*Id.*)  She stated

that "he pushed me so hard that he threw me on the ground" and that "[h]e was on top

7

of me." (*Id.*)  After she was on the ground, Plaintiff claims that the officer "had his knee

in [her] back." (*Id.* at 32.)  She next explained that:

> He picked me up, and he was throwing me, pushing me.  There's a little
> desk in the back room, and he had me leaning against that, and he
> grabbed my arms to put them behind my back, and he was doing it really,
> really, really hard, so I was crying and screaming and asking him to lighten
> it up a little bit, and he wouldn't.

(*Id.* at 32.)  Plaintiff claims that she was scared and that the physical altercation began

within ten minutes from the time she placed the ID into the time-delayed safe.  (*See id.;*

Killinger Dep. at 9-10.)  Killinger specifically recalled "continually telling [Defendants]

that [they] needed at least 10 minutes before [the employees] could get the ID" out of

the safe.  (Killinger Dep. at 14.)

Killinger recounted the physical altercation between Reinacher and Plaintiff as

follows:

> I remember [Plaintiff] walking through our back way, back hall over to
> help [with a customer], I remember seeing [Plaintiff] yelling at the officer,
> I'm helping a customer, or you know, whatever, I'm helping a customer.  I
> remember watching [Plaintiff] going to hand the cappuccino, whatever, to
> the customer, at that point the cop grabbed her hand and put her hand
> behind her back.
>
> Q.  Did you ever see her pull away from the police officer at that point in
> time?
> A.  I remember her yelling get off of me and pulling away.
>
> Q.  Did you see him actually physically grab her?
> A.  I seen [sic] him physically grab and take her arm behind her back.
>
> Q.  Did you see him do anything else to her?
> A.  Immediately after when he grabbed her hand, I went around the back,
> and as I was coming around the back, I saw him run her into the wall.
> There was like a metal shelf there that had pizza pans on it.  I remember
> seeing him push her into that, ram her into that, kind of dragging her from
> – pushing her from behind . . . .

(Killinger Dep. at 11.)

8

Plaintiff stated that the officer never informed her that she was under arrest before grabbing and throwing her.  (Pl.'s Dep. at 39.)  Once outside, Plaintiff was handcuffed and allegedly thrown against the officer's car.  When asked to explain what she meant by throwing, she stated "[Defendant Reinacher] didn't pick me up and throw me.  He forced me, pushed me hard against his car."  (Pl.'s Dep. at 39.)  Plaintiff was placed into the back of the officer's car.  Plaintiff testified that she asked Officer Reinacher "to loosen up a little bit, because he was hurting [her]." (Pl.'s Dep. at 43.)  Plaintiff claims that she informed Defendant Reinacher to loosen her handcuffs because they were causing her pain, but he refused.  (*Id.* at 80-81.)

On May 27, 2002, after being released from custody, Plaintiff visited a hospital emergency room for care.  (Pl.'s Dep. at 56.)  Plaintiff testified that her back, neck, and wrists were hurting and that she had bruises on her arms.  (Pl.'s Dep. at 53.)  Plaintiff also testified that she sought treatment for her back from a chiropractor.  (*Id.* at 57.)  She offers several exhibits to support her claims that she has been injured as a result of the incident occurring on May 26, 2002.  (*See* Pl.'s Exs. Q (Dr. Spathis letter diagnosis Plaintiff with cervical, thoracic and lumbar strains, associated spinal joint dysfunction, and proscribing chiropractic treatment), R (Dr. Spathis Daily Notes), and S (physical therapy records).)

Plaintiff filed this action in federal court asserting a cause of action under 42 U.S.C. § 1983 alleging that Defendants violated her constitutional rights under the Fourth and Fourteenth Amendment to be free from unreasonable searches and seizures, including claims for arrest without probable cause and excessive force.  (Pl.'s Compl. ¶¶ 42-46.)  Plaintiff has also asserted state law claims for assault, battery, false

9

arrest, false imprisonment, and malicious prosecution.  Defendants' motion seeks summary judgment on all claims.

## II STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

10

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("we must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  Plaintiff's Constitutional Claims Filed Pursuant to 42 U.S.C. § 1983

To prevail on a claim brought under 42 U.S.C. § 1983, Plaintiff must prove that Defendants acted "under color of law" and that their conduct deprived her of a right, privilege, or immunity secured by the Constitution or the laws of the United States.  42 U.S.C. § 1983; *Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir. 2003); *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1999).  The parties do not dispute that Defendants were acting under color of law and the court's focus is necessarily on whether Plaintiff can establish a violation of her clearly established constitutional rights.

Government officials, such as Defendants, "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Implicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004).  The doctrine recognizes that

11

"it is better to risk some error and possible injury from such error than not to decide or act at all." *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974).

Courts in the Sixth Circuit evaluate qualified immunity claims using a three-part inquiry. *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). First, the court must determine whether the plaintiff has alleged facts which, taken in a light most favorable to him, show that the defendant-official's conduct violated a constitutionally protected right. *Toms*, 338 F.3d at 524. Second, if the first inquiry is answered in the affirmative, the court determines whether the right that was violated was clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right. *Id.; Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Finally, the court determines whether the plaintiff has alleged sufficient facts and supported his allegations with sufficient evidence to indicate that what the official did was unreasonable in light of the clearly established constitutional right. *Toms*, 338 F.3d at 524.[2] The court must ask whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir. 1987).

## 1. Arrest Without Probable Cause Under the Fourth Amendment

---

[2] The United States Supreme Court, and some panel decisions of the Sixth Circuit, describe the qualified immunity inquiry in two steps, folding the third step described into the first two. *See Saucier*, 533 U.S. at 194; *Dunigan*, 390 F.3d at 491; *Comstock*, 273 F.3d at 702. The third step identified by the *Toms* court essentially imparts a Rule 56 analysis as a third step following the traditional qualified immunity analysis described in *Saucier*. *See Toms*, 338 F.3d at 524.

The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."  U.S. Const. amend. IV.

It is well-established that the Fourth Amendment requires probable cause for an arrest or seizure of free citizen, such as Plaintiff.  *See Michigan v. DeFillippo*, 443 U.S. 31, 36-37 (1979); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003).  If Defendants had probable cause to arrest Plaintiff on May 26, 2002, then her custodial apprehension was lawful and did not run afoul of the Fourth Amendment.  If Defendants had probable cause to arrest Plaintiff for a misdemeanor offense committed in their presence, they were also entitled to use a reasonable amount of force to affect such an arrest.  *See* Mich. Comp. Laws § 750.479(1); *Graham v. Conor*, 490 U.S. 386, 396 (1989).

Under federal law, "probable cause to arrest and prosecute is based on the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense.'"  *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)).  The Supreme Court has repeatedly explained "that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *DeFillippo*,

13

443 U.S. at 37. Courts are required to look at this question through the lense of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

"The probable cause determination is essentially the same under Michigan law." *Hinchman*, 312 F.3d at 204. "Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v. Champion*, 549 N.W.2d 849, 860 (Mich. 1996).

In this case, Defendants effected an arrest based on Michigan's resisting and obstructing statute, Mich. Comp. Laws § 750.479. Section 750.479 provides, in relevant part:

(1) A person shall not knowingly and willfully do any of the following:

(a) Assault, batter, wound, obstruct, or endanger a medical examiner, township treasurer, judge, magistrate, probation officer, parole officer, prosecutor, city attorney, court employee, court officer, or other officer or duly authorized person serving or attempting to serve or execute any process, rule, or order made or issued by lawful authority or otherwise acting in the performance of his or her duties.

Mich. Comp. Laws § 750.479(1)(a).

To establish this crime, the state must prove: (1) the conduct alleged obstructed, resisted, or opposed, (2) a police officer, (3) in his prescribed duties, and (4) the conduct was done knowingly and willfully. Mich. Comp. Laws § 750.479(1); *People v. Lozowsky*, 2004 WL 2347764, at *1 (Mich. Ct. App. Oct. 19, 2004). An act is done knowingly and willfully if the defendant intended to do the act to a police officer and did so knowing the person was a police officer. *People v. Gleisner*, 320 N.W.2d 340, 342

14

(Mich. Ct. App. 1982).  The offense requires that a defendant oppose a police officer by actual physical interference or by expressed or implied threats of physical interference. *People v. Vasquez*, 631 N.W.2d 711, 716-20 (Mich. 2001) (finding that lying to an officer about one's name and age "did not physically interfere with or threaten to physically interfere with the officer.").  Passive conduct, however, may sometimes be sufficient.  *Id.* at 720.  As the Michigan Supreme Court explained, "[w]e agree . . . that passive conduct may sometimes be sufficient to constitute obstruction under the 'resisting and obstructing' statute.  Passive conduct, if it rises to the level of *threatened* physical interference, constitutes 'obstruction' within the meaning of the statute."  *Id.*

"In Michigan, an officer may make a warrantless arrest of a person who commits a misdemeanor in the officer's presence."  *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir. 2002) (citing Mich. Comp. Laws § 764.15(1)(a)).  As such, if Defendants had probable cause to believe that Plaintiff was obstructing them in their official duties based on their own observations, they were authorized to seize and/or arrest Plaintiff on the day in question.

There remain, however, material triable issues of fact as to whether, under the circumstances of this case, the officers had probable cause to believe that Plaintiff was obstructing under Mich. Comp. Laws § 450.759.  When taking the evidence in a light most favorable to Plaintiff, the court finds that a reasonable jury could conclude that Plaintiff had placed the confiscated ID into the time-delayed safe before Defendants represented themselves as police officers.

In addition, there is testimony that Killinger informed the officers that there was a ten minute delay on the safe.  The store owner further testified that he spoke with one of

15

the Defendant officers, asking that officer to call local police, to make a report, and that
he had indicated to the state trooper that he would send somebody to the scene to
ensure that the confiscated ID was returned.  If Plaintiff placed the ID into the safe
before Defendants identified themselves as police officers and the store owner informed
the officers that he was sending someone to the scene and that local police would
return the ID after a report was made, then there was no passive conduct on the part of
Plaintiff that would permit any reasonable officer to conclude that she was obstructing in
violation of Mich. Comp. Laws § 450.479.  Any physical interference occurring based on
Plaintiff's refusal to return the confiscated ID was non-existent if Plaintiff placed the ID in
the time delayed safe before the officers identified themselves and requested the return
of the ID.  Further, if Plaintiff did not know the plain clothes customers were state
troopers when she deposited the ID into the safe there was no act done knowingly and
willfully.  *See People v. Gleisner*, 320 N.W.2d 340, 342 (Mich. Ct. App. 1982).  If such
findings of fact are made by the jury, no reasonable officer could have concluded that
Plaintiff's passive conduct rose to the level of threatened *physical* interference with the
performance of police duties.  *See Vasquez*, 631 N.W.2d 720.

During oral argument on the motion, Defendants' counsel argued that Plaintiff's
actions of handing off the phone to Larson for him to speak with the store owner and her
decision to walk to another part of the store to assist another employee in making coffee
for a customer provided a sufficient basis for a reasonable officer in Defendants'
position to believe that probable cause existed to arrest Plaintiff under Mich. Comp.
Laws § 450.479.  The court does not agree.  There exists evidence that the store owner
informed the MSP troopers that the ID would be returned and that he would send

16

someone to the store to make sure this occurred.  As such, Plaintiff's physical act of leaving the immediate presence of the officer to assist another employee with a customer in the store did not amount to threatened or actual physical interference.

In addition, any threatened physical interference that might arise after the ten minute time delay expired would not be at issue if the jury finds credible the evidence suggesting that Plaintiff's arrest occurred within this ten minute period.  Defendants' argument that there is no testimony establishing that Plaintiff agreed to open the safe and return the license after the ten-minute time delay is unavailing.  First, the evidence does not clearly establish that she indicated that she would not do so.  Second, there is testimony from the store owner that he spoke with an officer and that he would ensure that the ID was returned.  There is further evidence, that notwithstanding these facts, the officers proceeded to threaten the employees and ultimately arrested Plaintiff for obstruction before the ten minute time delay had expired.

It is quite conceivable that a reasonable jury could find the events occurred in such a manner that Plaintiff's actions simply could not have amounted to physical resistance or threatened physical resistance.  The record evidence permits a conclusion that Plaintiff did not physically resist the trooper's inquires or demands because the ID was already in the safe and the owner informed her and one of the Defendants that local police should be called and that they would return the ID.

A recent decision from another judge in this district is instructive.  In *Marrs v. Tuckey*, 362 F. Supp. 2d 927 (E.D. Mich. 2005), the court ruled that a passenger's refusal to provide a Michigan state trooper identification did not support probable cause to arrest based on Michigan Compiled Laws § 750.479.  In that case, the district court

ruled that an arrest of a passenger who refused to provide identification could not be supported based on probable cause to believe that § 750.479 was violated.  *Marrs*, 362 F. Supp. 2d at 940-42.  The *Marrs* court, also relying on the Michigan Supreme Court's interpretation of the criminal statute in *Vasquez*, explained:

> [T]his Court readily concludes, as did the state district court in dismissing the underlying criminal charge against Plaintiff, that Plaintiff's mere refusal to identify herself in response to Trooper Tuckey's inquiries did not constitute the sort of actual or threatened physical interference that is necessary under *Vasquez* to trigger arrest and prosecution under Michigan's "resisting and obstructing" statute.  The record does not indicate that Plaintiff physically resisted the trooper's inquiries or her detention in any way, or that she threatened any sort of violence or physical resistance in response to Trooper Tuckey's demands that she identify herself and statements that she would be arrested if she refused to comply.  Instead, she obstructed Trooper Tuckey's investigative efforts solely through the nonphysical, wholly verbal acts of refusing to cooperate and insisting that she had no obligation to do so.  Thus, as acknowledged by defense counsel at the March 10, 2005 hearing, and then again in Defendants' March 21, 2005 supplemental brief, Trooper Tuckey "was not authorized to arrest Plaintiff for 'resisting and obstructing' under [Mich. Comp. Laws] § 750.479, as the law existed at the time."

*Marrs*, 362 F. Supp. 2d at 942.  In *Marrs* the court denied a motion for summary judgment and determined that defendants were not entitled to qualified immunity.

Likewise, in this case, if the jury concludes that Plaintiff had already placed the confiscated ID into the time-delayed safe, that Killinger informed the officers that they would have to wait at least ten minutes to access the safe, that the store owner informed the officer that local authorities should be called to make a report and that the ID would be returned, there would be no basis for a reasonable officer to conclude that Plaintiff was physically obstructing or threatening physical interference with Defendants' duties.  On the other hand, if the jury were to find that Plaintiff placed the ID in the safe knowing that the officers were state troopers, the arrest would be supported by probable

cause.  If a jury were to believe Defendant Larson's testimony that Plaintiff ignored his requests for the ID and placed it in the safe after she knew him to be a MSP officer, Plaintiff's wrongful arrest claims (and several of her state claims) would fail because Defendants would have had probable cause to arrest Plaintiff under Michigan's resisting and obstructing statute.  Accordingly, a triable issue of fact remains and the court will deny Defendants' motion with regard to Plaintiff's claim for unlawful arrest under the Fourth Amendment.

## 2.  Excessive Force During the Course of an Arrest Under the Fourth Amendment

The sole constitutional standard for evaluating claims of excessive force during the course of an arrest is the reasonableness criterion of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004).  As such, Plaintiff's claims based on substantive due process under the Fourteenth Amendment are supplanted by her Fourth Amendment claims (incorporated through the Fourteenth Amendment) against the state actors.  The court will analyze Plaintiff's claims under the Fourth Amendment.  *See id.*

Determining whether the force used to make a particular seizure is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests."  *Graham*, 490 U.S. at 396.  "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight.'"  *Gaddis v. Redford Township*, 364 F.3d 763, 772

(6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).  Evidence related to the severity of a

plaintiff's injuries may also be relevant in determining the amount of force used.  *Martin*

*v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997) (the Supreme Court's reference to

the "nature and quality of the intrusion" in *Graham* must include consideration of the

severity of any injury inflicted).

Courts assess the reasonableness of an officer's conduct from the perspective of

a reasonable officer on the scene, not *ex post* with the benefit of 20/20 hindsight.

*Graham*, 490 U.S. at 396.  The court's reasonableness calculus allows "for the fact that

police officers are often forced to make split-second judgments--in circumstances that

are tense, uncertain, and rapidly evolving--about the amount of force that is necessary

in a particular situation."  *Graham*, 490 U.S. at 397.  The right to make a lawful seizure

"carries with it the right to use some degree of physical coercion or threat thereof to

effect it."  *Id.* at 396.  "Not every push or shove, even if it may later seem unnecessary in

the peace of a judge's chambers . . . violates the Fourth Amendment."  *Id.*  Totally

gratuitous uses of force, however, may be excessive.  *Gaddis,* 364 F.3d at 772 (citing

*McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)).  In addition, the subjective

intentions of the officers involved are not relevant to whether the force used was

reasonable.  *Graham*, 490 U.S. at 397.

Case law in the Sixth Circuit also recognizes that there are "circumstances under

which police officers can be held liable for failure to protect a person from the use of

excessive force."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Durham*

*v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996).  Generally, "a police officer who fails to act

to prevent the use of excessive force may be held liable when (1) the officer observed

20

or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Defendants argue that they are entitled to qualified immunity and summary judgment on Plaintiff's excessive force claim because there is no basis to conclude that the force used to arrest Plaintiff was objectively unreasonable in light of clearly established rights.  Defendants also argue that the force allegedly used does not rise to level of a constitutional violation.

Applying the three-step qualified immunity analysis to Plaintiff's excessive force claim reveals that a triable issue of fact remains and that the individual officers are not entitled to qualified immunity.  First, taking all of Plaintiff's allegations as true, the court finds that she has asserted a violation of the Fourth Amendment.  In other words, when taking Plaintiff's version of the events as true, the court finds that the force allegedly used would be excessive and constitute a violation of the Fourth Amendment.

As explained by the record citations above, Plaintiff alleges that she had already placed the confiscated license in a time delayed safe when Defendant Larson identified himself as a state trooper and demanded that the employees return the license.  (Pl.'s Dep. at 28.)  Plaintiff further alleges Killinger informed the officers of the ten minute time delay on the safe, Plaintiff telephoned the store owner and she was only following store policy.  The store's owner spoke to one of the officers on the telephone, asked for local police to be called, and assured the officer that the ID would be returned.  (*See* Pl.'s Dep. at 29, 30, 37; Killinger Dep. at 7-9, 14; Lekander I Dep. at 9-11.)

21

Nevertheless, Plaintiff avers that within the ten minute period from the time she placed the ID into the slot leading to the store's safe, Defendant Reinacher went after her as she went to assist another employee in making coffee for a customer. (Pl.'s Dep. at 30.) Plaintiff alleges that Defendant Reinacher yelled for her to give him the "F-ing" ID, that Reinacher then grabbed her arms and started throwing her to the back room of the store. (*Id.* at 30-32.) She claims that Defendant Reinacher grabbed her arms and put them behind her back "really hard," "threw" her toward the back room, pushed her, and shoved her to the ground. (*Id.*) She also avers that Defendant Reinacher had his knee in her back. (*Id.* at 32.)

Killinger recounted the physical altercation in his testimony, indicating that he saw Defendant run Plaintiff into a wall and that she was rammed into a metal shelf that had pizza pans on it. (Killinger Dep. at 11.)

Plaintiff's allegations, when taken as true, show that Defendant Reinacher may have used excessive force in arresting Plaintiff who posed no flight risk or who provided no physical resistance until the officer grabbed her while she was attending to another customer. This conduct, including ramming Plaintiff into a metal shelf, if accepted as true by a fact finder could constitute excessive force.

Defendants' reliance on the Sixth Circuit's recent decision in *Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004) to support their argument that the amount of force alleged by Plaintiff in this case does not rise to the level of a constitutional violation is misplaced. The confiscation of an underage license during a tobacco buy sting and the circumstances surrounding Plaintiff's arrest are a far cry from the "rapidly-evolving, highly-volatile" situation confronting the officers in *Noble*.

22

In *Noble*, the mother of a convicted felon who was a known flight risk filed a §

1983 action against police officers alleging unlawful arrest and excessive force in

violation of her Fourth Amendment rights.  The court granted the defendant officers

summary judgment based on qualified immunity, finding that the plaintiff's excessive

force claims against them failed because the allegations did not constitute a violation of

the Fourth Amendment.  *Id.* at 493-94.

The police officers in *Noble* responded to a call for assistance in apprehending

the plaintiff's son, a convicted felon and known flight risk.  *Id.* at 489-90.  The police had

reason to believe that the wanted felon was at his mother's home.  They arrived on

scene along with a K-9 unit.  The officers knocked on the plaintiff's back door and the

plaintiff opened the back interior door while remaining behind a locked screen door.  *Id.*

at 489.  One of the officers informed the plaintiff that they had come to take custody of

her son.  The plaintiff responded by saying "just a minute" and she shut the interior

door.  *Id.*  She then went to the basement and informed her son of the officers'

presence.  *Id.*

When the plaintiff returned and began opening the door, three officers rushed in.

One of the officers announced that someone was in the basement and another officer

alerted the K-9 to begin barking.  One person then came up from the basement of the

house passing the dog and entered the kitchen without incident.  *Id.*  Immediately

thereafter, Officer Nobel pushed the plaintiff in the back, she stumbled and moved on

the staircase.  The dog then bit the plaintiff three times on her leg. *Id.* at 489-90.  The

plaintiff then alleged that Noble "grabbed me by the neck, threw me outside and made

me lay face down of the cement side walk."  *Id.* at 490.  A friend of the plaintiff's

23

described the events as "pretty chaotic" with a lot of yelling and screaming.  *Id.*

After first ruling that the plaintiff has not been seized within the meaning of the

Fourth Amendment, the court examined whether the plaintiff's allegations of excessive

force against Officer Noble rose to the level of a constitutional deprivation.  The court

ruled that the allegations, even if proved, did not amount to a violation of the Fourth

Amendment.  The court explained:

> The relevant question, then, is whether a reasonable officer on the scene
> could have believed Officer Noble's push of Plaintiff from one step to the
> next in the close confines of the stairwell and landing while in the presence
> of a police dog was unlawful.  Officer Noble's subjective intentions are
> irrelevant.
>
> In her brief, Plaintiff admits she was "understandably upset" over the
> situation, but claims she posed no threat whatsoever to anyone.  Plaintiff
> is mistaken.  Kim Marshall, Plaintiff's own witness, stated the situation
> "was pretty chaotic, so there was a lot of yelling and screaming and
> hysterics going on."  Marshall stated Plaintiff "was begging" the officers
> not to hurt her son.  As the officers entered the home, Plaintiff was
> necessarily standing in front of them given the small confines of the
> landing.  *See* Joint App. at 348.  Plaintiff knew for certain Quincy was in
> the basement when Officers Jenkins and Noble entered the home.  The
> officers did not possess such knowledge as Plaintiff had closed the inside
> back door blocking the officer's view before she went to the basement to
> inform Quincy of the officers' presence.  Instead of moving out of the
> officers' path, Plaintiff made the decision to remain close by on the kitchen
> steps.
>
> Perhaps Officer Noble moved up the stairs past Plaintiff to cut off an
> escape route or get a view of his back side.  Regardless, we will not
> second guess Officer Noble's actions.  Officer Noble was confronted with
> a rapidly-evolving, highly-volatile situation which precluded the luxury of
> calm and reflective pre-response deliberation.  *See Claybrook v. Birchwell,*
> 199 F.3d 350, 359 (6th Cir. 2000).  Officer Noble had no opportunity to
> ponder or debate his reaction to the potentially explosive situation.  Simply
> stated, Plaintiff's insistence on remaining in the middle of a chaotic, tense,
> and rapidly evolving situation posed a risk to herself, to Quincy, the

> officers seeking to arrest Quincy, and the other individuals present.
> Moreover, Plaintiff's presence in the midst of this situation interfered with
> Officer Noble's efforts to perform his duties.

*Id.* at 493-94.

The current allegations do not give rise to a rapidly-evolving, potentially dangerous situation for the officers in question. Plaintiff was not a convicted felon and known flight risk, nor did she physically impose herself into a potentially dangerous situation with the officers. The facts and evidence do not suggest that Defendants had reason to fear or suspect that the employees posed a danger to them. The imposition complained of by the officers merely related to the return of a license that was confiscated during an attempted illegal purchase of cigarettes by a minor.

Second, the right to be free from such excessive force is clearly established in the case law. A reasonable officer would know that such conduct constitutes excessive force in violation of the Fourth Amendment. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004). As the Sixth Circuit noted in *Champion*,

> We have repeatedly stated that "the right to be free from excessive force
> is a clearly established Fourth Amendment right." *Neague v. Cynkar,* 258
> F.3d 504, 507 (6th Cir. 2001) (decided after *Saucier*). For example, we
> have articulated a clearly established right to be free from specific types of
> non-deadly excessive force, such as handcuffing an individual too tightly.
> *See Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993). We
> have also consistently held that various types of force applied after the
> subduing of a suspect are unreasonable and a violation of a clearly
> established right. *See, e.g., Phelps v. Coy,* 286 F.3d 295, 301 (6th
> Cir.2002) ("[T]here was simply no governmental interest in continuing to
> beat Phelps after he had been neutralized, nor could a reasonable officer
> have thought there was."); *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th
> Cir.1988) ("[A] totally gratuitous blow with a policeman's nightstick may
> cross the constitutional line."); *Lewis v. Downs,* 774 F.2d 711, 715 (6th
> Cir.1985) ("The unprovoked and unnecessary striking of a handcuffed
> citizen in the mouth with a nightstick is clearly excessive.").

*Champion*, 380 F.3d at 902. The conduct of Defendants in this case, as alleged by Plaintiff, would violate clearly established law.

The alleged conduct in this case includes claims that Plaintiff was "thrown" to the back room of the store, pushed, and "thrown to the ground" by Defendant Reinacher. Another employee also witnessed the officer run Plaintiff into a wall and "ram" her into a metal shelf. Plaintiff alleges that the officer put his knee in her back when she was face down on the floor and that he later pushed her hard against the police car. If Plaintiff's versions of the events are true, the relatively innocuous circumstances surrounding her confiscation of the license would render the alleged use of force unreasonable and excessive.

In addition, an individual has a lawful right to resist an unlawful arrest. *Darrah v. City of Oak Park*, 255 F.3d 301, 312-13 (6th Cir. 2001) ("under Michigan law, while arrestees have the right to use physical force to resist an unlawful arrest, third-party intervenors do not") (citing *City of Detroit v. Smith,* 597 N.W.2d 247, 249-50 (Mich. Ct. App.1999)). Accordingly, should the jury credit Plaintiff's version of the facts leading to her arrest, Defendants would have lacked probable cause to arrest her and therefore she would be entitled to resist such an unlawful arrest.

Third, and finally, when taking the evidence presented in a light most favorable to Plaintiff under Rule 56, the court finds that a reasonable jury could conclude that Defendants' conduct during Plaintiff's arrest and their failure to intervene was excessive under Fourth Amendment standards.

**B.  Plaintiff's State Law Claims**

**1.  False Arrest & False Imprisonment**

Plaintiff also filed state law claims for false arrest and false imprisonment.  False imprisonment has been defined by Michigan courts as "an unlawful restraint on a person's liberty or freedom of movement."  *Peterson Novelties, Inc. v. City of Berkely*, 672 N.W.2d 351, 362 (Mich Ct. App. 2003); *see also Clarke v. Kmart Corp.*, 495 N.W.2d 820 (Mich. Ct. App. 1992).  A false arrest "is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant."  *Peterson Novelties*, 672 N.W.2d at 362; *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894 (Mich Ct. App. 1982).  "To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause."  *Peterson Novelties*, 672 N.W.2d at 362.  If the arrest was supported by probable cause, there has been no false arrest or false imprisonment and "[w]hether the plaintiff could actually have been convicted is irrelevant because actual innocence is not an element."  *Id.*

Defendants argue that Plaintiffs' state law claims of false arrest and false imprisonment also fail because there is no question that probable cause existed to arrest Plaintiff for obstructing the officers under Mich. Comp. Laws § 450.759.  (Defs.' Mot. Br. at 14.)  As discussed above, however, there remain genuine issues of material fact that may undercut a reasonable officer's believe that probable cause existed to support the arrest in question.  Accordingly, Defendants' motion will also be denied as to Plaintiff's state law claims of false arrest and false imprisonment.

27

## 2.  Assault & Battery

Assault and battery are intentional torts and the Michigan Court of Appeals

described their elements in *Smith v. Stolberg*, 586 N.W.2d 103 (Mich. Ct. App. 1998):

> An assault is "any intentional unlawful offer of corporal injury to another
> person by force, or force unlawfully directed toward the person of another,
> under circumstances which create a well-founded apprehension of
> imminent contact, coupled with the apparent present ability to accomplish
> the contact."  *Espinoza v. Thomas,* 189 Mich. App. 110, 119; 472 N.W.2d
> 16 (1991).  This Court defined battery as "the wilful and harmful or
> offensive touching of another person which results from an act intended to
> cause such contact." *Id.*

*Smith*, 586 N.W.2d at 105.

As a general rule, intentional torts are not protected by governmental immunity;

however, governmental actions which would normally constitute intentional torts are still

protected by immunity if those actions are justified.  *Brewer v. Perrin*, 520 N.W.2d 198,

202 (Mich. Ct. App. 1984); *Sudul v. City of Hamtramck*, 562 N.W.2d 478 (Mich. Ct. App.

1997); *Vanvorous v. Burmeister*, 2004 WL 1334707 (Mich. Ct. App. June 15, 2004).

Under Michigan law, an officer may use such force as is reasonably necessary to

effect a lawful arrest.  *Young v. Barker*, 405 N.W.2d 395 (Mich. Ct. App. 1991).  If an

officer uses reasonable force then his actions in making a lawful seizure are justified.

On the other hand, "where an officer uses excessive force, he may be held liable for

assault and battery even where the arrest is valid."  *Atkins v. City of Flint*, No. 246697,

2004 WL 1103979, *4 (Mich. Ct. App. May 18, 2004) (citing *White v. City of Vassar*, 403

N.W.2d 124 (1987)).

Defendants argue that the state law assault and battery claims fail because there is no genuine issue of fact that the amount of force used was objectively reasonable, justified, and therefore cannot constitute an assault or battery under Michigan law. (Defs.' Mot. Br. at 18.)  Because there remain disputed issues of fact impacting whether Defendants had probable cause to arrest Plaintiff and whether the force used in detaining Plaintiff was excessive, the court is unable to conclude that these state law claims fail as a matter of law.

### 3.  Malicious Prosecution

"[A]ctions for malicious prosecution have historically been limited by restrictions that make them difficult to maintain."  *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609 (Mich. 1998).  To make out a claim of malicious prosecution, a plaintiff has the difficult burden of proving four elements: (1) that the defendant has initiated a criminal prosecution against him; (2) that the criminal proceedings terminated in his favor; (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions; and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.  *Id.* at 609-10; *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 363 (Mich. Ct. App. 2003).

As the Michigan Supreme Court has explained, a claim asserted "against a private person requires proof that the private person instituted or maintained the prosecution *and that the prosecutor acted on the basis of information submitted* by the private person that did not constitute probable cause."  *Matthews*, 572 N.W.2d at 610 (emphasis added).  Furthermore, "*initiation* of the prosecution is at the exclusive

29

discretion of the prosecutor," *id.* at 613 n.24 (emphasis added), and "the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause." *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995).

Here, it is undisputed that the prosecuting official never *initiated* criminal charges and Plaintiff was released. As such, there is no evidence that the officers knowingly swore to false facts in a criminal complaint supporting probable cause for the prosecuting official to initiate a criminal prosecution. Accordingly, the court will grant Defendants' motion for summary judgment on Plaintiff's claims for malicious prosecution.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion for Summary Judgment and Dismissal" [Dkt. # 22] is GRANTED IN PART and DENIED IN PART. It is granted with respect to Plaintiff's Fourteenth Amendment claims and Plaintiff's state law claims for malicious prosecution. The motion is denied in all other respects.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  June 10, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 10, 2005, by electronic and/or ordinary mail.

 S/Lisa G. Teets
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\Even Clerk's Orders\04-71004.Shook.SJ.Order.wpd